## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RUSSELL PERCY DUNHAM,

                Petitioner,

v.                                    Case No. 12-CV-15322

LLOYD RAPELJE,

                Respondent.

_____/

### OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF
### HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY

### I. INTRODUCTION

Petitioner Russell Percy Dunham, a Michigan prisoner, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting that he is being held in custody in violation of his constitutional rights. Petitioner was convicted of two counts of second-degree murder, Mich. Comp. Laws § 750.317, following a jury trial in the Eaton County Circuit Court and was sentenced in 2008 as a fourth habitual offender, Mich. Comp. Laws § 769.12, to concurrent terms of 34 to 60 years imprisonment. In his petition, he raises claims concerning the admission into evidence of statements that he made to police at the scene and while hospitalized, the effectiveness of trial counsel, and cumulative error.

Respondent argues that the habeas petition should be denied. For the reasons set forth, the court denies the petition and denies a certificate of appealability.

### II. BACKGROUND

Petitioner's convictions arise from a double-fatality auto collision that occurred in Eaton County, Michigan on May 24, 2007. The Michigan Court of Appeals summarized

the incident as follows:

> Defendant's convictions arose out of a traffic accident that resulted in the death of two people. Defendant's passenger, Carolyn Merrill, and the driver of the other vehicle, Penny Sharp, both died from injuries sustained in the accident. Defendant had been traveling in excess of 80 miles per hour, failed to stop at a stop sign, and collided with the vehicle driven by Sharp. Defendant's blood alcohol content (BAC) was .17.

*People v. Dunham*, No. 287584, *1 (Mich. Ct. App. Aug. 12, 2010) (unpublished).

At trial, the prosecution presented 23 witnesses. Petitioner's defense counsel

provided the following factual summary of that testimony on direct appeal:

> Julie JoAnn Merrill, Carolyn Merrill's mother, testified that at the time of the accident on May 24, 2007, her daughter Carolyn Merrill lived with her at 8261 Columbia Highway in Eaton County, which is located approximately 3/4 mile west of Canal Road. (TT Volume I, page 232, 233) The speed limit on Columbia Highway is 55 miles per hour and as one goes down Columbia Highway from her house, there is a hill that goes down, a bump in the road and then it goes back up a hill. (TT Volume I, page 234) Columbia Road has a stop sign in both directions and Canal Road has the right of way. (TT Volume I, page 235) Merrill testified that Carolyn was on probation and was not supposed to be drinking or associating with anyone that was drinking. (TT Volume I, page 237) This restriction was from a drunk driving arrest two weeks before the accident on May 24, 2007. (TT Volume I, page 239) Carolyn also had an eight o'clock curfew imposed by the court. (TT Volume I, page 240) Defendant first met Carolyn on the first weekend in May. (TT Volume I, page 242) Julie Merrill drove defendant to her house from the courthouse in Charlotte on May 14, 2007, but she did not travel through the intersection at Columbia and Canal Road to get there. (TT Volume I, page 245) Defendant was at the courthouse in Charlotte for Carolyn Merrill's hearing on May 18, 2007 and after the hearing, drove to Merrill's house with Carolyn, not going through the intersection of Canal and Columbia. When they left the home that afternoon, they headed east towards Canal Road. (TT Volume I, page 250, 251) Merrill saw the truck, coming from the east, pull into her driveway between 6 and 7 p.m. Carolyn had to be home for a curfew at 8:00 p.m. Carolyn had to return to the jail between 10 or 10:30 and watched a movie with defendant before going back to jail. (TT Volume I, page 252, 253) Merrill was not at the house when they left. (TT Volume I, page 253) On Sunday, May 20, 2007, Merrill was sitting in her living room reading the Sunday paper, when she saw defendant arrive in his vehicle from the east. Later, defendant and Carolyn turned left out of the driveway and headed east towards the Columbia and Canal intersection. (TT Volume I, page 254) Defendant and Carolyn returned at 8:45 p.m., 45

2

minutes after the curfew coming west on Columbia Road. Defendant said it was his fault they were late. (TT Volume I, page 256) Merrill did not see defendant leave, but speculated that he would go towards the Columbia and Canal intersection (TT Volume I, page 257) On May 21, 2007, defendant brought Carolyn home between 7:30 and 8:00 p.m. (within the curfew) The vehicle came and left from the east. (TT Volume I, page 258) Carolyn made arrangements for Eatran to take her around. (TT Volume I, page 261) On May 24, 2007 at 7:00 p.m., Merrill talked to Carolyn twice by telephone and was told by Carolyn that everything was fine and she would be home. Merrill reminded Carolyn that she needed to be home before 8:00 p.m., not pulling in the driveway at 8:00 p.m. Merrill was told that the crash occurred at five minutes to 8 p.m. (TT Volume I, page 263)

Paul Merrill, Carolyn Merrill's father, testified that he was not present on May 20th and 21st when defendant reportedly came to the house. (TT Volume I, page 271) Merrill heard that defendant was living on the south side of Lansing, somewhere in the Jolly and MLK area and assumed that the route to his home would be down Columbia. (TT Volume I, page 275) While there were other routes that defendant could have taken to Canal Road, he didn't necessarily have to drive down Columbia. (TT Volume I, page 276)

Roland Gary Hensley lives at 9120 Columbia Highway at the intersection of Columbia Highway and Canal Road. (TT Volume I, page 279, 280) Hensley observed a midsize vehicle traveling westbound on Columbia Highway at an excessive rate of speed. (TT Volume I, page 281) The speed limit is 55 miles per hour and he heard a crash. (TT Volume I, page 282) One vehicle was a red pickup truck and the other was a dark colored small pickup truck. (TT Volume I, page 284) One person was in the passenger seat of the dark colored truck and the other, a male was out in front of the dark colored truck in the grass. Volume I, page 286)

Donna Osgood testified that she was driving southbound on Canal Road to the intersection at Columbia and noticed smoke and vehicles in the field. Osgood called 911. (TT Volume I, page 295) Osgood observed a female in the passenger seat of the green truck and the defendant lying on the ground in front of it. (TT Volume I, page 296, 297) Defendant had a broken leg and told her his name was Tom. (TT Volume I, page 298)

John Rasmussen, firefighter for the Eaton Rapids fire department, arrived at the scene and observed Carolyn Merrill attempting to climb out of the green pickup truck. (TI Volume I, page 303,306)

Robin Freer, a paramedic, arrived at the scene and rode in the ambulance with the defendant to the hospital. (TT Volume I, page 309) Defendant told Freer that he was going to the bar and that he had two beers. Defendant

3

had an odor of alcohol on his breath. (TT Volume I, page 311) Defendant went in and out of consciousness during the trip to the hospital. (TT Volume I, page 314)

David Hendon, paramedic, attended to Carolyn Merrill, who was laying on her back in the green pickup truck with her feet sticking out the window. (TT Volume I, page 317) A Jaws of Life was used to remove her from the vehicle. Merrill was breathing but unable to answer questions. (TT Volume I, page 318) As soon as Merrill was placed in the ambulance, she lost her heartbeat. (TT Volume I, page 321)

Timothy Daust, Eaton County Sheriff's Department Deputy, took photographs of defendant while he was at Sparrow Hospital. (TT Volume I, page 323) The bruises and marks on his body were not consistent with being a passenger in the vehicle, although he could not draw any conclusions himself from the seatbelt harness marks on his left shoulder. (TT Volume I, page 325, 327)

Joyce DeJong, M.D., medical director of forensic pathology, conducted an autopsy of Penny Sharp, who had significant injuries, including a severe head injury, and concluded that the cause of death was from multiple injuries from a vehicle to vehicle collision. As medical examiner, Dejong classified the manner of death as accidental, not homicide, suicide, natural or indeterminate. Dejong determined the manner of death was accident, not homicide as there was not an intent to do harm to Penny Sharp. (TT Volume II, page 12-14) Dejong also conducted an autopsy on Carolyn Merrill, who had multiple rib fractures, a diaphragmatic hernia with ruptured diaphragm. (TT Volume II, page 18, 19) An abrasion starting near the right shoulder extending across the right breast indicated that Merrill was wearing a shoulder harness in the passenger seat. (TT Volume II, page 21) The cause of death was the same as that of Penny Sharp (multiple injuries due to vehicle verses vehicle collision, classified as accident). (TT Volume II, page 24) Merrill's injuries were possible to have occurred in a vehicle traveling at 55 miles an hour. (TT Volume II, page 31)

Johnny Lopez, deputy sheriff, Eaton County, testified that when he arrived at the crash scene, there was still daylight and the roads were dry. (TT Volume II, page 34, 35) Lopez observed a red pickup truck and a green pickup truck in the field to the west of the Canal and Columbia Road intersection. (TT Volume II, page 35) Sharp and Merrill were still in their vehicles. (TT Volume II, page 38, 39) Defendant appeared to be conscious and when asked what direction he had been traveling, said he thought he was on Waverly Road. (TT Volume II, page 41) Defendant had an odor of intoxicants and said he didn't know his direction of travel or where he had been coming from. Defendant said he drank way too much

4

and made a comment about being "fucked up." (TI Volume II, page 43, 44, 48) Lopez agreed that in traffic accidents, people often become disoriented. Lopez did not observe a steel rod coming out of defendant's leg. (TT Volume II, page 47) The roadways at the intersection of Canal and Columbia have similarities from both directions with the difference that one road (Columbia) has a stop sign and the other doesn't. (TT Volume II, page 48,49)

Chrisanna Ruiz, had lunch with her friend, Carolyn Merrill, Julie Merrill and the defendant on the day of the accident. (TT Volume II, page 51) When asked by the prosecutor how much defendant liked his truck, Ruiz testified that his "granddad had kept it for him while he was incarcerated previously, and kept it in good condition." (TT Volume II, page 53)

Jean Jones testified that she lived on Shreve Street in Lansing, and the defendant was at her house with Carolyn Merrill on May 24, 2007 at 6:30 p.m. for approximately an hour. (TT Volume II, page 60) Merrill was on a curfew and was in a hurry to leave as she had to be home at eight o'clock. She was really upset. She kept saying I've gotta go, come on, now, now, come on, come on, I wanna go, hurry, hurry, you know. And defendant said I'm getting ready, I'm coming as fast as I can. (TT Volume II, page 61, 62) Merrill got into the truck, started it up and honked the horn, whereupon defendant went into the truck and Merrill backed out of the driveway and drove north towards Eaton Rapids. (TT Volume II, page 63-65)

Gerald J. Cunningham was at Jean Jones' house when the defendant and Merrill left at approximately 7:43 p.m. on May 24,2007. (TT Volume II, page 71)

Richard Buxton, Eaton County Sheriff Detective, took photographs of the accident scene. (TT Volume II, page 75) No skid marks were observed. (TT Volume II, page 76) Buxton took measurements to turn over to an accident reconstructionist. (TT Volume II, page 91) The jury was shown the photographs of the vehicles (TT Volume II, page 85-87)

Timothy Fandel, Eaton County Sheriffs Department detective obtained a DNA sample from defendant at the jail. (TT Volume II, page 97, 100)

Shannon Rasmussen was driving down Canal Road from Eaton Rapids and came upon the crash scene at Canal and Columbia on May 24,2007. Rasmussen saw a red truck rolled over and a green truck in the field. (TT Volume II, page 105) Two gentlemen were kneeling down besides the defendant. Carolyn Merrill sitting in the passenger seat of the green truck, with her legs stuck. (TT Volume II, page 107, 108)

Michael Schnepp, Deputy Sheriff, Eaton County, photographed the

5

defendant's green truck at the storage lot the next day. (TT Volume II, page 113-116) Schnepp collected the airbags and took blood samples. (TT Volume II, page122) Schnepp videotaped a simulated drive from Shreve Street in Lansing to the crash scene and beyond to the Merrill's home. (TT Volume II, page 123) Schnepp noted that there were eight traffic lights and three stop signs en route. (TT Volume II, page 125)

Elizabeth A. Hoogstra, Eaton County District Court Probation officer, testified that Carolyn Merrill had previously been arrested for drunk driving. (TT Volume II, page 130, 131) District Judge Harvey Hoffman had ordered an 8 p.m. curfew and Carolyn was put on a Scram tether. (TT Volume II, pages 131, 133)

Kathy Fox, forensic scientist for the Michigan State Police crime lab, received airbags for analysis and tested blood samples. (TT Volume II, page 146, 152)

Amelia Proctor, forensic scientist for the Michigan State Police crime lab, analyzed cuttings from the passenger side airbag. Proctor received Carolyn Merrill's and the defendant's samples from Kathy Fox. (TT Volume II, page 162) DNA profiles indicated that the airbag cuttings from both the driver and passenger side matched the sample from Carolyn Merrill. The defendant was excluded as being the contributor of DNA from both samples. (TT Volume II, page 166)

Sue Ann Fitzgerald, medical technologist at Sparrow Hospital, testified that the analysis of defendant's blood sample was .172 blood alcohol content. (TT Volume II, page 183)

Detective Jeff McNeil, Eaton County Sheriff's Department, investigated the case and interviewed Mr. Dunham, Donna Osgood, Paul and Julie Merrill, Chrisanna Ruiz and Joyce DeJong, M.D. (TT Volume II, page 188) McNeil filmed the simulation of a vehicle travelling 81 miles an hour going through the intersection at Canal and Columbia, without stopping. (TT Volume II, page 189, 190) McNeil interviewed defendant at Sparrow Hospital but did not read the defendant his *Miranda* rights because defendant was not under arrest or in custody. The interview was taped, transcribed and played to the jury. (TT Volume II, page 192, 196, 197) Defendant mentioned that he had been drinking beers and had a deuce (22-ounce beer). (TT Volume II, page 198) McNeil did not know what medications defendant had been taking. The interview was taken approximately 17 hours after the accident following defendant's surgery. (TT Volume II, page 200) McNeil thought defendant was focused in the interview, but some of defendant's statements were not helpful to the officer. Defendant was in a lot of pain and didn't remember a number of items. (TT Volume II,

6

page 201)[1]

Rod Sadler, Eaton County Sheriff's Department sergeant, was part of the crash reconstructionist team. (TT Volume II, page 210) Sadler determined that defendant's green truck, a C-1500, had been traveling westbound on Columbia Highway and collided with a southbound K-2500 red heavy duty pickup at the intersection of Columbia and Canal roads. (TT Volume II, page 217,221) East of the intersection, was a stop ahead sign, approximately 816 feet away. (TT Volume II, page 223) Penny Sharp was observed with her seatbelt on but the airbag was not deployed for the reason that the wiring was broken in the crash. (TT Volume II, page 238) Defendant's green truck was inspected by mechanics and their report did not indicate that the brakes had failed. (TT Volume II, page 246, 247) Sadler concluded that at the time of impact, defendant's vehicle was traveling at a minimum speed of 81 miles per hour and Penny Sharp's vehicle was traveling at approximately 57 per hour. (TT Volume II, page 260) Sadler testified that alcohol and speed played a large role in this accident and that at a speed of 80 miles an hour a driver is not able to take in what's around, including cars pulling of driveways, warning signs ahead and stop signs. (TT Volume III, page 14) It was Sadler's opinion that Carolyn Merrill was a passenger in defendant's pickup, and that defendant ran the stop sign at 81 miles an hour and that Penny Sharp probably never saw the collision coming. (TT Volume III, page 15).

* * *

Lisa Babb, friend of defendant, testified that defendant had stayed overnight at her home for two weeks prior to the accident on May 24, 2007 and was planning to leave on a trip on May 25, 2007. Babb testified that she is familiar with the intersection of Canal and Columbia Highway and arrives at that intersection by driving down Canal Road. (TT Volume III, page 39, 40)

The defendant elected not to testify on his own behalf. (TT Volume III, page 38).

Def. App. Brf., pp. 2-10 (footnote added).

After the close of the evidence, the jury convicted Petitioner of two counts of second-degree murder. The trial court subsequently sentenced him, as a fourth habitual offender, to concurrent terms of 34 to 60 years imprisonment.

Petitioner filed an initial appeal of right with the Michigan Court of Appeals raising

---

[1]During the interview, Petitioner denied being the driver of the vehicle.

7

a sufficiency of the evidence claim. Petitioner then obtained new counsel and filed a motion for new trial with the state trial court raising claims concerning the admission of the statements that he made at the scene and in the hospital and the effectiveness of trial counsel. The trial court conducted an evidentiary (*Ginther*) hearing in 2009.

At that hearing, trial counsel testified that he objected (unsuccessfully) to the admission of Petitioner's hospital statements at the preliminary examination, but did not move to suppress them at trial. Counsel stated that he obtained Petitioner's medical records from his family and reviewed them before trial. He did not speak to Petitioner's aunt or friend about the hospital statements. Counsel recalled questioning Detective Fandel about his awareness of Petitioner's medications. Counsel argued that Petitioner's hospital statements were affected by his medications during closing arguments, but did not present evidence about them. Counsel did not seek an expert on accident reconstruction. With regard to Petitioner's swastika tattoo, counsel believed that it was not visible to the jury and did not think that any such jury instructions were necessary. He recalled reviewing the jury instructions and thought that they were accurate as to the malice element of the charged offenses.

Counsel consulted with Petitioner two or three times a month, totaling 10 or more meetings before trial. They discussed trial strategy, including whether Petitioner should testify at trial. Petitioner's memory was sketchy for the period shortly before and after the crash. Counsel did not have knowledge of Lisa Babb being present when detectives came to interview Petitioner at the hospital. Counsel explored several potential defense theories, including that Petitioner was not the driver and that he was not intoxicated. He did not pursue a strategy that Petitioner was not speeding because

8

that factor seemed very clear to him based upon the reports and his research and he thought the jury would be bored with number crunching.  His settled strategy was to create reasonable doubt about the malice element for second-degree murder.

Counsel recalled questioning Deputy Lopez about Petitioner's statements at the scene and acknowledged that Petitioner's statement about being "F-ed up" could be interpreted different ways and could refer to his injuries and/or intoxication.  Counsel stated that he did not seek to suppress Petitioner's statements at the scene because he thought that phrase could benefit the defense by referring to Petitioner's physical condition.  He thought that evidence of Petitioner's confusion about where they had driven could create doubt that he was the driver, which was a possible defense early in the case.  Counsel also believed Petitioner's hospital statements could benefit the defense.  Counsel noted that Petitioner was not read his *Miranda* rights and he wanted to emphasize that Petitioner just had major surgery and was in poor physical condition and could not remember some things as a result.  He also wanted Petitioner's statement that he was not the driver to be disclosed.  Counsel listened to the recording of the interview and thought that Petitioner's conversation with the detectives was fairly strong and he was not fading in and out, slurring his words, or providing nonsensical answers.  After researching the matter, counsel did not think that a suppression motion would be successful.  He therefore focused on creating doubt about the malice element, showing that Petitioner was not familiar with the intersection where the crash occurred, and humanizing Petitioner in the eyes of the jury.  *Ginther* Hrg. Tr., pp. 7-37.

Petitioner's friend, Lisa Babb, testified that when she visited Petitioner in the hospital, he would be awake and talking fine one minute and then asleep the next

9

minute.  She was at the hospital when the police spoke with him, but was not in the room during the interview.  She could not recall Petitioner's mental state after the police left.  She did not listen to the recording of the interview nor read the transcript.  *Id.* at pp. 49-64.

A Meridian Township firefighter/paramedic, Kenneth Phinney, testified that there are concerns about shock and head trauma following a serious car accident.  As a responder, he would check to determine if the accident victim was oriented to person, time and place.  If he heard someone say he was "F-ed up" after an accident, he would assume he was hurting and that his mental status was impaired.  Phinney also testified that Petitioner's statement in the ambulance that he had "two beers" is a standard answer given by drivers who are suspected of intoxication.  Phinney acknowledged that a crash victim's mental status can change over time, even within a matter of minutes. *Id.* at pp. 68-85.

A registered nurse, Karen Smiley, testified as an expert about Petitioner's medications during and after his surgery.  She stated that the sedatives and painkillers that he received would have still been in his system at the time of his police interview. Common effects of those medications are sleepiness, dizziness, confusion, altered memory, and amnesia.  Petitioner was a level one trauma patient in the neuro-intensive care unit who was in traction with casts.  She listened to the recording of Petitioner's interview.  She believed that his voice was stronger at some points than others, but that it did not necessarily show his level of cognition.  She would consider Petitioner cognitively impaired at the time of his interview based upon his medications.  She was unaware of any cognitive testing of Petitioner while he was hospitalized.  She

10

acknowledged that Petitioner's loss of memory near the time of the accident was not unusual given the severity of the crash.  She also acknowledged that Petitioner was able to accurately respond to several of the officer's questions and recall several events leading up to the accident.  She agreed that the police stopped the interview after about 19 minutes when Petitioner indicated that he was not feeling up to answering more questions.  Smiley also acknowledged that she did not know how much morphine Petitioner may have had in his system at the time of the interview or how it personally affected him.  She further acknowledged that the medical records reflected that medical personnel reviewed his plan of care with him in the morning before his police interview. *Id.* at pp. 90-140.

Petitioner testified that he did not remember the police detectives questioning him at the hospital and that he first learned that he had made those statements after his arraignment.  Petitioner said that he met with defense counsel once at his office and four or five times at the jail.  He spoke to counsel about his police statements and counsel told him that they did not really hurt him.  Counsel told him that he was not going to seek to suppress the hospital statements, but they did not discuss suppression of the on-scene statements.  Petitioner authorized counsel to obtain his medical records, but he does not believe that counsel did so or spoke with medical professionals.  Petitioner further testified that he had two surgeries and that his mobility was limited while he was hospitalized.  He did not recall being subject to neurological tests.  He listened to the recording of his hospital interview when it was played for the jury.  He acknowledged that some of the statements he made to the police were accurate and some were inaccurate.  He claimed that he would not have agreed to

11

speak to the police if his judgment had not been impaired.  *Id.* at pp. 151-166.

Eaton County Detective Daniel Prueter testified that he participated in the interview of Petitioner at the hospital.  He and another detective checked in at the nurse's station and saw Lisa Babb in the hallway before entering Petitioner's room.  No one objected to their presence or said that he could not answer questions.  Detective Prueter did not notice anything which made him think that Petitioner was "zoned out."  Petitioner responded to their questions until he indicated that he was in pain and did not want to continue, and the interview ended.  They made a continuous recording of the interview, which was admitted into evidence, as was a transcript.  During the interview, Petitioner could not remember what happened during the time just before and after the accident, but was able to provide information about what he did earlier that day.  Detective Prueter did not inquire into Petitioner's medications, but suspected he was medicated.  He did not see any signs that Petitioner was impaired or drowsy during the interview. Petitioner appeared to understand them, responded appropriately to their questions, and, at times, corrected them.  At the time of the interview, Petitioner was not a suspect, was not read his *Miranda* rights, and was free to leave the room (which would have required assistance).  The police were investigating the facts.  Detective Prueter did not think of Petitioner's statements as a confession because he did not admit he was driving.  Detective Prueter believed that Petitioner had "selective memory" whereby he was remembering things he wanted to tell the police and not remembering things he did not want to tell them.  *Id.* at pp. 169-197.

Following the hearing, the trial court denied the motion for new trial.  *People v. Dunham*, No. 07-341-FC (Eaton Co. Cir. Ct.), Pet. Exh. B.

12

Petitioner then filed a supplemental brief on appeal with the Michigan Court of Appeals raising claims concerning the sufficiency of the evidence, the voluntariness of his on-scene and hospital statements to police, the effectiveness of trial counsel, and cumulative error.  The Michigan Court of Appeals denied relief and affirmed Petitioner's convictions.  *People v. Dunham*, No. 287584 (Mich. Ct. App. Aug. 12, 2010) (unpublished).  Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order.  *People v. Dunham*, 490 Mich. 857, 802 N.W.2d 342 (2011).

Petitioner, through counsel, thereafter filed his federal habeas petition.  He raises the following claims:

I.   Statements made by Mr. Dunham while he was in the neurointensive care unit of the hospital were involuntary and inadmissible because Mr. Dunham's will was overborne when he made the statements. Mr. Dunham had recently emerged from major surgery, was heavily sedated, and was not given *Miranda* warnings when he was interrogated for 20 minutes by two experienced detectives. Trial counsel was ineffective for failing to object to the statements.

II.  Statements made by Mr. Dunham while at the scene of the accident and while in the ambulance were involuntary and inadmissible. Mr. Dunham repeatedly slipped in and out of consciousness, did not know where he was, and did not even know his own first name. Trial counsel was ineffective for failing to object to the statements.

III. Trial counsel was ineffective for failing to properly investigate Mr. Dunham's case and prepare a defense to the charges, which caused trial counsel to not subject the case to meaningful adversarial testing as required by the Constitution.

A.  Trial counsel was ineffective for not seeking the appointment of an expert witness in accident reconstruction related to speed.

B.  Trial counsel was ineffective for failing to object to a

13

photograph of Mr. Dunham with a swastika tattoo, a
demonstrative video that purported to show what a
driver would experience traveling at 81 miles an hour
when police made no attempt to use a vehicle similar
to Mr. Dunham's truck, and jury instructions that were
slanted to the government's theory of the case.

IV.   The grant of Mr. Dunham's habeas petition is warranted because of
the number and significance of the errors that occurred resulting in
a trial that was fundamentally unfair and a guilty verdict that was
reached because of the ineffective assistance of counsel and
unconstitutionally obtained and admitted evidence.

Respondent has filed an answer to the petition contending that it should be denied

because the claims lack merit.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified

28 U.S.C. § 2241 *et seq.*, provides the standard of review for federal habeas cases

brought by state prisoners.  The AEDPA provides in relevant part:

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect
to any claim that was adjudicated on the merits in State court proceedings
unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law,
as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a

rule that contradicts the governing law set forth in [Supreme Court cases]' or if it

'confronts a set of facts that are materially indistinguishable from a decision of [the

14

Supreme] Court and nevertheless arrives at a result different from [that] precedent.'"
*Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*,
529 U.S. 362, 405-06 (2000)); *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "[T]he
'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to
'grant the writ if the state court identifies the correct governing legal principle from [the
Supreme] Court but unreasonably applies that principle to the facts of petitioner's
case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413);
*Bell*, 535 U.S. at 694.  However, "[i]n order for a federal court to find a state court's
application of [Supreme Court] precedent 'unreasonable,' the state court's decision
must have been more than incorrect or erroneous.  The state court's application must
have been 'objectively unreasonable.'"  *Wiggins*, 539 U.S. at 520-21 (citations omitted).
The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court
rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'"
*Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7);
*Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court has held that "a state court's determination that a claim
lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'
on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86,
101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme
Court emphasized "that even a strong case for relief does not mean the state court's
contrary conclusion was unreasonable."  *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63,
75 (2003)).  Pursuant to § 2254(d), "a habeas court must determine what arguments or
theories supported or . . . could have supported, the state court's decision; and then it

must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court" and quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). While the requirements of "clearly established law" are determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667,

16

671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV.  DISCUSSION

### A.  On-Scene Statement

Petitioner first argues that he is entitled to habeas relief because the statements that he made to the police on the ground and in the ambulance at the scene of the accident were involuntary and trial counsel was ineffective for failing to seek suppression of those statements. According to Deputy Sheriff Lopez, who questioned Petitioner for a few minutes at the scene, Petitioner indicated by nodding his head that he was the driver. Petitioner also told him that he thought he was on Waverly Road, that he did not know where he had been driving, that he drank way too much, and that he was "F-ed up." Trial Tr., Vol. II, pp. 41-44.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at

17

687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

In the typical case, many potentially legitimate strategic options are open to counsel, but choices must be made. In that regard there exists a "wide range of professionally competent assistance," *Id.* at 690, and to satisfy the performance prong, a petitioner must identify acts of counsel that were outside that range. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and to the state appellate courts that review their performance. "The standards created by *Strickland*

18

and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In order to establish that trial counsel was ineffective under the *Strickland* standard in this context, Petitioner must demonstrate that counsel erred in failing to challenge the voluntariness of his statements and seek suppression, and that he was prejudiced by counsel's conduct. To establish prejudice, Petitioner must show that "had the motion been filed there was a reasonable probability that the evidence would have been suppressed, and the outcome of the trial would have been different had the evidence been suppressed." *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994); *see also Woodard v. Chappius*, _ F. App'x _, 2016 WL 276908, *1 (2d Cir. Jan. 22, 2016) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)); *Wilkens v. Lafler*, 487 F. App'x 983, 994 (6th Cir. 2012); *Evans v. Booker*, 461 F. App'x 441, 443 (6th Cir. 2012) (citing *McCalvin v. Yukins*, 444 F.3d 713, 722 (6th Cir. 2006)).

Petitioner raised this issue on direct appeal and the Michigan Court of Appeals considered it the context of his ineffective assistance of counsel claims and denied relief.[2] The court ruled that Petitioner's on-scene statements were voluntary, that

---

[2] The Michigan Court of Appeals appropriately analyzed this claim in the context of trial counsel's effectiveness, given that Petitioner did not move to suppress the statements before trial or object to their admission. The United States Supreme Court has stated that "the Constitution does not require a voluntariness hearing absent some contemporaneous challenge to the use of [a] confession." *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977).

19

*Miranda* warnings were not required, that Petitioner failed to show that counsel was ineffective, and that Petitioner could not demonstrate that a suppression motion would have resulted in a different outcome at trial. *Dunham*, 2010 WL 3184397 at *2-3.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[3] Petitioner fails to establish that trial counsel erred and fails to show that he was prejudiced by counsel's conduct in any evvent. At the *Ginther* hearing, counsel testified that he decided not to challenge the voluntariness of Petitioner's on-scene statements because he believed that his comment about being "F-ed up" could be interpreted different ways and refer to his injuries. Counsel also testified that his overall trial strategy was to negate the malice element by showing that Petitioner was not very familiar with the intersection and by humanizing him in the eyes of the jury. Counsel's decision to use Petitioner's on-scene statements at trial rather than seeking to suppress them before trial was thus a strategic decision. The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective. *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (an ineffective assistance of counsel claim "cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").

Counsel's decision not to seek suppression of Petitioner's on-scene statements was also reasonable because the statements were voluntary. The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive

---

[3]The court would reach the same result under a *de novo* standard of review.

activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). In determining whether a confession is voluntary, the ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Those circumstances include: (1) police coercion (a "crucial element"), (2) length of interrogation, (3) location of interrogation, (4) continuity of interrogation, (5) suspect's maturity, (6) suspect's education, (7) suspect's physical and mental condition, and (8) whether the suspect was advised of his or her *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). All of the factors should be closely scrutinized, *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961), but without coercive police activity, a confession should not be deemed involuntary. *See Connelly,* 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"). The burden of proving that a statement was involuntary rests with the petitioner. *Boles v. Foltz*, 816 F.2d 1132, 1136 (6th Cir. 1987).

In this case, there was no coercive activity by the police. The investigating deputy's questions were brief and lasted only a few minutes, the questions were asked in public and in the ambulance as part of initial efforts to investigate the accident, and Petitioner was 30 years old with a GED and past experience with the criminal justice system. Although Petitioner was injured in the accident and experienced some confusion, he was able to respond to the basic questions posed by the deputy.

21

Moreover, evidence that a person "suffered . . . from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary . . . some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). There is no evidence that the deputy used any coercive tactics at the scene of the accident.

Petitioner was not advised of his *Miranda* rights, but such warnings were not required as he was neither in police custody nor otherwise deprived of his freedom through police action. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Panak*, 553 F.3d 462, 465 (6th Cir. 2009). Indeed, questioning a person at the scene of an incident is normally not considered custodial interrogation. *See, e.g., Miranda*, 384 U.S. at 477 ("General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding"); *Cordoba v. Hanrahan*, 910 F.2d 691, 693-94 (10th Cir. 1990) (drunk driver questioned at scene of collision was not in "custody" before arrest); *Ingram v. Warden*, No. 1:12-cv-158, 2013 WL 3082640, * (S.D. Ohio June 18, 2013) (petitioner not in custody when questioned by police at car accident scene); *United States v. Howard*, No. 3:10cr039, 2010 WL 4867904, * (M.D. Tenn. Nov. 22, 2010) (defendant was not in custody when police questioned him about the shooting at the scene); *Stafford v. Warden*, No. 1:09-cv-417, 2010 WL 3703236, *3-5 (S.D. Ohio July 26, 2010) (report and recommendation).

22

Considering the lack of police coercion and the other factors, the Michigan Court of Appeals was unquestionably correct that the on-scene statements were voluntary. At a minimum, and more pointedly for purposes of deferential federal habeas review, the court cannot say that the state court's decision to that effect was unreasonable.

Furthermore, even assuming that Petitioner could establish that trial counsel erred by failing to seek suppression of the on-scene statements, Petitioner cannot demonstrate that he was prejudiced by counsel's conduct.  First, a suppression motion would likely have been denied given the lack of coercive police conduct.  Second, had the statements had been suppressed, the result of the proceeding would not likely have been altered, given the other significant evidence of guilt presented at trial.  Even without Petitioner's admission that he drank too much and was "F-ed up," the jury had independent proof of his drinking through blood alcohol testing which revealed a blood alcohol content of 0.17, which is more than twice the legal limit for driving a motor vehicle in Michigan.  The jury also had evidence of Petitioner's excessive rate of speed, his disregard for a stop ahead warning and a stop sign, his possible familiarity with the intersection, and the lack of skid marks or braking before the crash – all of which supported a finding of the malice necessary to convict him of second-degree murder.

Consequently, even if the on-scene statements had been suppressed, there is no reasonable probability that the outcome of the trial would have been different.[4] Petitioner fails to establish that trial counsel was ineffective under the *Strickland*

---

[4]Put another way, any error in the admission of the on-scene statements was harmless as it did not have "a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in the Sixth Circuit).

standard or that he is otherwise entitled to habeas relief on this claim.

### B.  Hospital Statement

Petitioner relatedly asserts that he is entitled to habeas relief because the statements that he made to the police at the hospital were involuntary and trial counsel was ineffective for failing to seek suppression of those statements.  In his recorded statement, Petitioner admitted that he had been drinking beer, including 22-ounce beers, and maybe some shots, on the day of the accident.  Petitioner remembered that he and his girlfriend were on their way from his aunt's house to his girlfriend's house when the incident occurred but could not remember any details of their route or the collision.  He recounted places where they went that day (they included, pathetically, an Alcoholics Anonymous meeting and two bars), but could not recall times.  Petitioner denied driving the vehicle and said that his girlfriend drove because he had been drinking.  Hospital Interview Tr., Pet. Exh. J.

This claim is also governed by the standard set forth in *Strickland, supra*. Petitioner must prove that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  Again, in this context, Petitioner must show that counsel erred in failing to challenge the voluntariness of his statements and seek suppression, and that he was prejudiced by counsel's conduct, *i.e.,* had the motion been filed there was a reasonable probability that the evidence would have been suppressed and the outcome of the trial would have been different.  *Lowry*, 21 F.3d at 346; *see also Woodard*, 2016 WL 276908 at *1; *Wilkens*, 487 F. App'x at 994.

Petitioner raised this issue on direct appeal and the Michigan Court of Appeals

24

considered in the context of his ineffective assistance of counsel claims and denied

relief.  The court ruled that there was no clear error in the trial court's finding that the

hospital statements were voluntary, that *Miranda* warnings were not required, and that

Petitioner could not prevail on his ineffective assistance of counsel claim because he

failed to show that a suppression motion would have resulted in a different outcome at

trial.  *Dunham*, 2010 WL 3184397 at *2-3.[5]

    The state court's denial of relief is neither contrary to Supreme Court precedent

nor an unreasonable application of federal law or the facts.[6]  Petitioner fails to establish

that trial counsel erred and fails to show that he was prejudiced by counsel's conduct.

At the *Ginther* hearing, counsel testified that he decided not to challenge the

voluntariness of Petitioner's hospital statements because he believed that they could

actually benefit the defense.  He noted that Petitioner was not advised of his *Miranda*

rights and said that he wanted to emphasize that Petitioner had major surgery, was in

poor physical condition, and could not remember things clearly as a result.  He also

wanted Petitioner's driving denial to be disclosed.  Additionally, counsel did not believe

that a suppression motion would be successful because he listened to the recording of

the interview and thought Petitioner sounded fairly strong and was not fading in and

---

[5]The Michigan Court of Appeals also ruled that Petitioner's hospital statement
denying that he was the driver was an admission of fact not subject to a voluntariness
inquiry.  This aspect of the decision is contrary to Supreme Court precedent, *see, e.g.,
Miranda*, 384 U.S. at 476-77; *Bram v. United States*, 168 U.S. 532, 541-42 (1897); see
also *Rhode Island v. Innis*, 446 U.S. 291, 301 n. 5 (1980), but is not dispositive here
given that the court also upheld the trial court's determination that the statement was
voluntary and ruled that counsel was not ineffective because suppression would not
have affected the outcome at trial.

    [6]The court would reach the same result under a *de novo* standard of review.

out, slurring his words, or giving nonsensical answers.[7]  Counsel's decision not to seek suppression of the hospital statements was thus a strategic one and well within the bounds of reason under the circumstances.  The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective.  *Moss*, 286 F.3d at 859.

Counsel's decision not to seek suppression of Petitioner's hospital statements was also reasonable because the statements were voluntary.  Again, the court must consider the totality of the circumstances, which include:  (1) police coercion (a "crucial element"), (2) length of interrogation, (3) location of interrogation, (4) continuity of interrogation, (5) suspect's maturity, (6) suspect's education, (7) suspect's physical and mental condition, and (8) whether the suspect was advised of his or her *Miranda* rights. *Withrow*, 507 U.S. at 693-94.  All of the factors should be considered, but without coercive police activity, a confession should not be deemed involuntary.  *Connelly,* 479 U.S. at 167.

In this case, Petitioner agreed to speak with the two detectives at the hospital and there is no evidence of coercive activity by those detectives during the interview, the interview lasted just 20 minutes, was conducted in Petitioner's hospital room without objection by medical personnel (who were free to come and go), and Petitioner was 30 years old with a GED and past experience with the criminal justice system.  While Petitioner was recovering from the car accident and related surgery, in some pain, and medicated during the interview, such factors alone are insufficient to find that

---

[7]The court notes that counsel moved to suppression the hospital statements at the preliminary examination, but the motion was denied.

26

his hospital statements were involuntary. *See Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004) (ruling that petitioner's statements were voluntary even though he was hospitalized with a broken nose, in pain, on pain medication, and had been intoxicated), *abrogated on other grounds by Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010); *Newman*, 889 F.2d at 94 ("Evidence that a defendant suffered...from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary....some element of police coercion is always necessary."). Additionally, Petitioner appeared to the detectives to be coherent, responding appropriately to questions, not fading out of consciousness or slurring his words; he even corrected the detectives on some points. When Petitioner indicated that he was in pain and feeling mixed up, the detectives terminated the interview.

Petitioner was not advised of his *Miranda* rights, but such warnings were not required as he was neither under arrest nor in police custody. *See Miranda*, 384 U.S. at 444; *see also Thompson*, 516 U.S. at 112; *Mathiason*, 429 U.S. at 495. Questioning a suspect in a hospital room, when he or she is not under arrest, is generally not considered custodial interrogation. *See, e.g.*, *United States v. New*, 491 F.3d 369, 373-74 (8th Cir. 2007) (defendant who was interviewed "in a private hospital room, confined to his bed in a neck brace and under medication" was not in custody); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (suspect was not in custody when questioned at hospital as there was no evidence that the police were involved in his hospitalization). This is particularly true here where Petitioner was not only free to terminate the interview, but in fact did so: the detectives stopped when Petitioner

27

indicated that he was not up to answering any more questions.  Considering the lack of police coercion and the other factors, the court agrees with the Michigan Court of Appeals that Petitioner's hospital statements were voluntary.  Moreover, and deferentially, the court cannot say that the state court's decision to that effect was unreasonable.

Furthermore, even assuming that Petitioner could establish that trial counsel erred by failing to seek suppression of the hospital statements, Petitioner cannot demonstrate that he was prejudiced by counsel's conduct.  First, a suppression motion would likely have been denied given the lack of coercive police conduct.  Second, even if the statements had been suppressed, the result of the proceeding would likely have been the same given the other significant evidence of guilt presented at trial.  Absent the hospital statements, the jury still had evidence of Petitioner's 0.17 blood alcohol content, his excessive rate of speed, his disregard for a stop ahead warning and a stop sign, his likely familiarity with the intersection, and the lack of skid marks or braking before the crash – all of which supported a finding of the malice necessary to convict him of second-degree murder.  Even if the hospital statements had been suppressed, there is no reasonably probability that the outcome of the trial would have been different.[8]  Petitioner fails to establish that trial counsel was ineffective under the *Strickland* standard or that he is otherwise entitled to habeas relief on this claim.

### C.  Other Claims of Ineffective Assistance of Trial Counsel

Petitioner also asserts that he is entitled to habeas relief because trial counsel

---

[8]In other words, as with the on-scene statements, any error in the admission of the hospital statements was harmless under *Brecht, supra*, 507 U.S. at 637.

was ineffective for:  (1) failing to obtain an expert to challenge the State's accident reconstruction expert's testimony regarding the speed of the vehicle, (2) failing to object to a demonstrative video showing a vehicle traveling at 81 miles per hour, (3) failing to object to a photograph of Petitioner which showed a swastika tattoo, and (4) failing to object to the jury instruction on intent.

These claims are also governed by the standard set forth in *Strickland, supra*. Here again, a petitioner must prove that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687. To satisfy the performance prong, the petitioner must identify acts that were "outside the wide range of professionally competent assistance."  *Id.* at 690.  It is presumed that counsel provided adequate assistance and the petitioner must overcome the presumption that the challenged actions were sound trial strategy.  *Id.* at 689-90.  As to the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

And again, [t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Harrington*, 562 U.S. at 105 (internal and end citations omitted).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

Petitioner first asserts that trial counsel was deficient for failing to obtain an expert to challenge the prosecution's accident reconstruction expert's testimony regarding the speed of his vehicle.  Petitioner raised this issue on direct appeal and the

Michigan Court of Appeals denied relief finding that Petitioner failed to establish that trial counsel erred and/or that he was prejudiced by counsel's conduct.  The court noted that an expert was not necessary to present a defense, that factors other than speed also supported the prosecution's malice theory, that lay testimony also indicated that Petitioner's vehicle was going between 80 and 90 miles per hour, and that Petitioner had not presented expert testimony to support this claim.  *Dunham*, 2010 WL 3184397 at *4.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  Well-established federal law requires that defense counsel conduct a reasonable investigation into the facts of a defendant's case, or make a reasonable determination that such investigation is unnecessary.  *Wiggins*, 539 U.S. at 522-23; *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007); *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning . . . guilt or innocence."  *Towns*, 395 F.3d at 258.  That being said, decisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy.  When making strategic decisions, counsel's conduct must be reasonable.  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-23.  The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense.  *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

At the *Ginther* hearing, trial counsel stated that he reviewed the reports and

30

decided not to seek an accident reconstruction expert to challenge the speed of Petitioner's vehicle because it seemed clear to him that the speed estimates were accurate and he did not want to bore the jury with number crunching. Counsel's decision in this regard was strategic and within reason. The fact that his strategy was ultimately unsuccessful does not mean that he was ineffective. *Moss*, 286 F.3d at 859.

More importantly, Petitioner fails to show that he was prejudiced by counsel's conduct. He offers no expert testimony or other evidence to support his assertion that the prosecution's accident reconstruction expert's testimony was erroneous or could have been refuted by another expert. Conclusory allegations without evidentiary support are insufficient to warrant federal habeas relief. *See Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify habeas relief); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide sufficient basis for an evidentiary hearing on habeas review). Additionally, a lay eyewitness testified about Petitioner's vehicle's excessive rate of speed. Given such circumstances, Petitioner fails to establish that counsel erred and/or that he was prejudiced by counsel's conduct in this regard.

Petitioner next asserts that trial counsel was deficient for failing to object to a demonstrative video showing a vehicle traveling at 81 miles per hour. Petitioner raised this issue on direct appeal and the Michigan Court of Appeals denied relief finding that Petitioner failed to establish that counsel erred because the evidence was properly admitted under state law. *Dunham*, 2010 WL 3184397 at *4.

The state court's denial of relief is neither contrary to Supreme Court precedent

31

nor an unreasonable application of federal law or the facts.  Given the state court's

determination that the video was properly admitted into evidence under state law, and

the deference accorded such state law decisions on habeas review, *see Bradshaw v.

Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including

one announced on direct appeal of the challenged conviction, binds a federal court

sitting on habeas review"); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (habeas relief

does not lie for perceived errors of state law); *Lewis v. Jeffers*, 497 U.S. 764, 780

(1990), Petitioner cannot establish that trial counsel erred or that he was prejudiced by

counsel's conduct.  Counsel cannot be deemed deficient for making a meritless

argument or futile objection.  *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2014)

("Omitting meritless arguments is neither professionally unreasonable nor prejudicial.");

*United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000).  Petitioner fails to

establish that counsel was ineffective.

Petitioner next asserts that trial counsel was ineffective for failing to object to the

use of a photograph which showed his swastika tattoo.  Petitioner raised this issue on

direct appeal and the Michigan Court of Appeals denied relief.  The court found that

while counsel's failure to object to the photograph resulted from a misconception about

the tattoo's visibility, Petitioner failed to show that he was prejudiced by counsel's

conduct given the trial court's instruction that the jury could only convict Petitioner

based upon satisfactory proof of the elements of the offense.  *Dunham*, 2010 WL

3184397 at *5.

The state court's denial of relief is neither contrary to Supreme Court precedent

nor an unreasonable application of federal law or the facts.  Even accepting the

argument that counsel erred by not objecting to the photograph or ensuring that the tattoo was blocked out, Petitioner cannot establish that he was prejudiced by counsel's conduct. His claim that the jury convicted him based upon the tattoo is purely speculative. Moreover, the trial court properly instructed the jury about the elements of the offense and the proper consideration of the evidence. Jurors are presumed to follow the court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors ... take an oath to follow the law as charged, and they are expected to follow it."). Petitioner fails to establish that he was prejudiced by counsel's conduct.

Lastly, Petitioner asserts that trial counsel was ineffective for failing to object to the jury instruction on intent. Petitioner claims that the instruction on the malice required to prove second-degree murder was slanted in the prosecution's favor because it listed multiple factors, such as high blood alcohol content, excessive speed, disobeying traffic control devices, and an admission of intoxication, which were argued by the prosecution in his case. Petitioner raised this issue on direct appeal and the Michigan Court of Appeals denied relief finding that Petitioner failed to establish that any part of the instruction inaccurately stated the law and that his rights were sufficiently protected. *Dunham*, 2010 WL 3184397 at *5.

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. At the *Ginther* hearing, trial counsel testified that he did not object to the malice jury instruction because he believed that it was accurate. While Petitioner asserts that the instruction was favorable to the prosecution, he neither alleges nor establishes that it was a

33

misstatement of the law.  Consequently, he cannot establish that counsel erred and/or that he was prejudiced by counsel's conduct.  As noted, counsel cannot be deemed ineffective for failing to make a futile or meritless objection.  *Coley*, 706 F.3d at 752; *Steverson*, 230 F.3d at 225.

Moreover, given the significant evidence of Petitioner's guilt, including his blood alcohol content, his high rate of speed, his disregard for the posted warning and stop sign, his likely familiarity with the intersection, and the well-known dangers of drinking and driving, Petitioner cannot show that he was prejudiced by counsel's conduct.  He thus fails to establish that trial counsel was ineffective under the *Strickland* standard. Habeas relief is not warranted on these claims.

### D.  Cumulative Error

Lastly, Petitioner asserts that he is entitled to habeas relief based upon the cumulative effect of the alleged errors at trial.  The Michigan Court of Appeals addressed this claim on direct appeal and rejected it finding that the claim lacked merit. *Dunham*, 2010 WL 3184397 at *6.

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  The Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  Furthermore, the Sixth Circuit has ruled that such a cumulative error claim is not cognizable on habeas review.  *See Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)); *see also Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012) (ruling that trial counsel cumulative error claim was not cognizable and citing

34

*Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010), and *Moore, supra*). Petitioner thus fails to state a claim upon which relief may be granted as to this issue. Moreover, given that none of his habeas claims have merit, he cannot establish that he is entitled to relief based upon cumulative error. Habeas relief is not warranted on this claim.

## V. CONCLUSION

Based on the foregoing discussion, the court concludes that Petitioner's claims lack merit and do not warrant federal habeas relief. Accordingly, the court DENIES and DISMISSES WITH PREJUDICE the petition for a writ of habeas corpus.

Before Petitioner may appeal this decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Having considered the matter, the court concludes that Petitioner fails to make a substantial showing of the denial of a constitutional right as to his habeas claims. Accordingly, the court DENIES a certificate of appealability.

IT IS SO ORDERED.

                                         s/Robert H. Cleland
                                        ROBERT H. CLELAND
                                        UNITED STATES DISTRICT JUDGE

Dated:  March 28, 2016

35

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 28, 2016, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

36